Filed 10/30/25  In re D.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E085395 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J302312, J302313) |
| v. | OPINION |
| Daniel L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

Daniel L. (Father) challenges the juvenile court's order terminating visitation with his two children at the disposition hearing. He contends that the court abused its discretion by terminating visitation without first ordering visitation in a therapeutic setting or obtaining psychological evaluations of the children. We disagree and affirm.

BACKGROUND

I. *Referral and detention*

Daniel (12 years old) and Diane (six years old) came to the attention of San Bernardino County Children and Family Services (CFS) in September 2024 when CFS received an immediate response referral alleging that Father had physically and emotionally abused Daniel. Daniel told law enforcement that Father punched, slapped, and pushed him, causing him to strike his head on the wall. Daniel had "redness" under his right eye and on his right cheek. He tried to commit suicide by hanging himself in his bedroom, but he changed his mind and ran away instead. Daniel was taken to the hospital and evaluated, and Father was arrested for felony child abuse and taken to the West Valley Detention Center.

The children were the subject of several child welfare referrals between 2017 and 2023, including allegations of physical abuse, emotional abuse, sexual abuse, and general neglect.

The social worker met with the children's mother, Susan O. (Mother), who explained that she had been released from jail on parole about six months ago, after serving four years for driving under the influence of alcohol (Veh. Code, § 23153, subds.

2

(a) & (b)), mayhem (Pen. Code, § 203), and driving with a suspended license (Veh. Code, § 14601.2, subd. (a)). Mother told the social worker that Father was granted sole custody of the children while she was in jail. Mother claimed that she had been sober for approximately five years. She said that she was attending therapy and taking medication, but she was not enrolled in any substance abuse treatment program or attending any meetings. Mother reported that Father disciplined the children by yelling and spanking them on the buttocks with a belt, and she denied that Father left any marks or bruises on them.

The social worker also spoke to Diane. Diane did not have any marks or bruises, and she appeared healthy. Diane reported that she and Daniel were watching television when they should have been doing their chores. When Father told them to finish their chores, Daniel refused. Father took Daniel's phone away, and Daniel asked Diane to ask Father for the phone so that he could call Mother. Father told Diane that Daniel needed to calm down, and Daniel "attack[ed]" Father and demanded his phone. Daniel "dug his nails" into Father's arm, pushed and punched him, and threw things around the home. Father slapped Daniel twice across the face, and Daniel ran away. Father searched for Daniel in the apartment complex but could not find him.

When the social worker interviewed Daniel, he reported that when he or Diane makes a "'big' mistake," Father spanks them on the buttocks with a belt. Daniel said that during the altercation, Father came into his bedroom to find Daniel's phone, and Father searched the room by "'turning it over.'" Father told Daniel to clean his room, and

3

Daniel followed Father and "tried to wrestle the phone back from [him]." Daniel was angry and threw a large plastic container across the room, and Father "struck" Daniel in the face, causing him "to fall back and hit the back of his head on the wall." Father grabbed Daniel by the arm, picked him up, and "budge[d] him towards his room." Daniel considered committing suicide, but "at the last minute," he changed his mind and ran away. Daniel ran to a nearby store, and an employee called the police because Daniel appeared "distressed."

Daniel said that three years ago, Father slapped him in the face for misbehaving at school. Daniel said that Father calls him "'stupid'" and a "'failure.'" Daniel said that he tried to commit suicide because of Father's conduct and emotional abuse. He reported that he sometimes feels that he does not "deserve to live." He said that he had been diagnosed with attention deficit hyperactivity disorder, depression, and anxiety. He had been on medication but stopped after his doctor "felt he did not need it anymore."

The social worker reported that "it [was] unclear whether or not [Daniel's] disclosures [were] entirely reliable, as it appears the child has an observed tendency to conflate real events with his internal thoughts. [Daniel's] description of the incident is similar to that reported by [Diane], with a noted increase in intensity which is inconsistent with the child's observable injuries. There is no doubt the child was physically abused by [Father] during this altercation as observed by the child's bruise on his face, but the undersigned notes the child has a recorded history of dramatizing and

4

exaggerating based on previous investigations which were reviewed prior to meeting [Daniel].”

The social worker interviewed Father in jail. Father reported that he and the children were at home, and “the day had gone by without any concerns.” Father noticed that Daniel had not finished his chores, and Father told Daniel to give him his phone as punishment. Daniel became upset and followed Father to the living room. Father told Daniel to finish cleaning his room, and Daniel threw a tantrum, “‘[got] in [Father’s] face,’” and screamed, “‘I’m so done, I’m so done.’” Daniel began throwing things and then “‘squared up’” with Father. Daniel began to hit Father, and Father grabbed him “on [his] head” and asked, “‘what is going on with you right now?’” Father said that he did not intend to cause any harm to Daniel and was only trying to stop Daniel from hitting him. Father told the children to go to their room, and after “some time passed,” Father heard Daniel run out of the home.

Father said that he disciplines the children by taking their electronics or television privileges away, and he uses a belt on their buttocks “if they continue to disobey.” Father said that he rarely used corporal punishment, and he said that he does not strike the children hard enough to mark or bruise them. Father denied the emotional abuse allegations, and he said that he does not call Daniel names. Father reported that Daniels’s psychiatrist had taken him off medication because of the progress Daniel had made.

CFS obtained a detention warrant for both children and placed them with their maternal aunt, Victoria O.

5

In October 2024, CFS filed petitions under section 300 of the Welfare and Institutions Code as to both children. (Unlabeled statutory references are to this code.) The petitions alleged that Father physically and emotionally abused Daniel, resulting in Father's incarceration and putting the children at risk of further abuse or neglect. The petitions also alleged that Mother had a history of alcohol abuse, a criminal history, and a prior dependency case.

At the detention hearing, Minor's counsel asked the court not to order visits for Father and Daniel, because it was not in Daniel's best interest. Father's counsel indicated that Father would submit to an order that Daniel not be forced to visit but would object to a no-visitation order. The court detained the children, ordered supervised visitation for the parents, and set a combined jurisdiction and disposition hearing for later that month.

II.    *Jurisdiction and disposition*

CFS reported that it had received the police report regarding the incident between Father and Daniel. The police report noted that following the altercation, Daniel tried to hang himself with a belt in his closet, decided not to, and left the home instead. Daniel was afraid of Father and no longer wanted to live with him. Daniel reported that when he left the home, he was concerned for Diane's safety. Law enforcement had interviewed Diane, and she reported that Father and Daniel had an argument resulting in a physical altercation. She reported that Father does not hit her and that she feels safe with him.

Following the detention hearing, the social worker interviewed Diane again. Diane defined "safe" as "'not getting hurt.'" She told the social worker that she does not

6

feel safe when Father spanks her. She described Father as "'bad,'" and she said that Father has guns in the home. She rated her feeling of safety a two on a scale of one to 10. She told the social worker that Father either spanks her or takes away her tablet when she is in trouble.

The social worker also interviewed Daniel. Daniel defined safe as "'out of the way of danger,'" "'being protected,'" and "'secure.'" He rated his feeling of safety a three on a scale of one to 10, and he said that he did not feel safe with Father and "is 'probably not going back with him.'" He said that Father "'drinks a lot'" and is abusive. Daniel did not want to return to Father, and Father was the reason that he has had "'thoughts of hurting [him]self'" since he was five years old. Daniel said that he wanted to see a therapist because he was angry and mad.

Daniel said that Father disciplines him by spanking him on the buttocks and chest with a belt. Daniel reported that Father "'[found] ways to get [him] in trouble'" and "'hits [him] whenever he feels like it.'" Daniel said that punishment was less severe for Diane, explaining that she gets spanked with a belt but "'only [he] get[s] hit.'"

Father denied the allegations of physical abuse and said that Daniel "'exaggerates his negative feelings.'" Father said that Daniel was unable to regulate his emotions and that Daniel "'snaps at his sister too.'" Father said that he disciplines his children by taking their electronics away, and he said that they have open communication.

Mother reported that she told Father that she "did not believe in" spanking the children as a form of discipline, and she denied knowing of any abuse. Mother was

7

aware of Daniel's suicidal ideations, and she had been informed of his suicide attempt after Daniel ran away from home. Mother reported that Father discontinued Daniel's medication "because [Father] does not believe in mental health." Father told Mother that Daniel's therapist felt that Daniel no longer needed his medication. Mother would beg Father to continue Daniel's medication, but he refused or told her that Daniel had appointments scheduled. Mother believed that Father "was dishonest about this" and that in fact "Daniel was not attending any longer."

Victoria (the maternal aunt and caregiver) reported that this was the second time that the children had been placed in her care as a result of a child welfare case. She said that in the previous case, Daniel had been left alone at home and was found wandering in the streets while Father was at work. The children were returned to Father's care after he participated in family reunification services. Victoria reported that she was aware that Father spanked the children, but she was not aware of "additional physical abuse" because "'he would not hit them in front of people, so we didn't know.'" She said that although Father "'looks good on paper' because he does not have a criminal history" like Mother's, he is "'vindictive and controlling'" and "'only cares about what he wants' and not what is in the best interest of the children." Victoria believed that "if it wasn't for Daniel leaving the home to find help, he would potentially be dead because of lack of care" by Father.

Mother was open about her substance abuse history and past incarceration. She was currently enrolled in "substance [ab]use, anger management, mental health services,

[and] parenting classes," and she took random drug tests and attended Alcoholics Anonymous. Her parole officer said that she had made good progress. She "'[took] full responsibility'" for her actions, and she was cooperative with CFS. She wanted to participate in family maintenance services "with a safety plan established" for the children.

The children declined to visit Father, because they were afraid of him. After the social worker informed Father that Daniel did not want to see him, Daniel left a voicemail with the social worker expressing that he wanted to visit Father. The social worker heard Father in the background on the voicemail coaching Daniel to explain why he wanted to visit Father. The voicemail occurred during an unsupervised phone call, which the caregiver did not know about. Daniel reported that he felt guilty about not answering Father's calls, because Father called "'all the time.'"

A few days later, the social worker terminated Father's supervised phone contact with the children. The social worker believed that visitation was detrimental to the children's well-being. The social worker reported that Father did not respect boundaries and was unable to follow court orders.

On the date set for the jurisdiction and disposition hearing in October 2024, Father's counsel asked the court to order that Father's visits be held in a therapeutic setting. County counsel informed the court that CFS did not have "the ability to do visitation in a therapeutic setting" and that family therapy was potentially available. Counsel informed the court that the social worker terminated Father's supervised phone

calls with the children because of Father's unauthorized contact and failure to follow court orders. The caregiver had expressed that they felt unsafe during Father's visits and requested that visits be held only at CFS's office. The court denied Father's request for visitation in a therapeutic setting, and it confirmed a pretrial settlement conference for December 2024.

At the pretrial settlement conference, minor's counsel requested that the court continue the hearing to allow the children to complete psychological evaluations. Father's counsel again requested visitation in a therapeutic setting, and the court granted CFS the authority to provide it. The court recessed, it later recalled the matter after becoming aware that additional information for the court had been filed the previous day.

In the additional information for the court, CFS reported that it had received referrals with allegations of Father sexually abusing Diane. CFS determined that there was insufficient evidence to determine whether the abuse had occurred. CFS also reported that Daniel had an "'outburst'" during his afterschool program, and he tried to call Mother, Father, the social worker, and the caregiver. CFS reported that the children were still not ready to visit Father, but they did have a video visit with Father on his birthday. CFS reported that it had reason to believe that Father had been attempting to have unsupervised and unauthorized contact with Daniel. Diane had expressed that she would be willing to visit Father only if Daniel was present. CFS reported that it believed that supervised visits with Father would be detrimental to the children.

The court acknowledged CFS's belief that visits were detrimental, and the court stated that "there seem[ed] to be a pretty good basis for that." Minors' counsel again requested that the court order psychological evaluations for the children. Father's counsel argued that visits should not be found detrimental, because Father was "eager" to visit his children and was "not crossing any particular boundaries." Counsel argued that there was reason to believe that Daniel had untreated mental health concerns, which should be evaluated before the court made a detriment finding. The court declined to make a detriment finding and noted that "because of [Father's] lack of boundaries [it did] have concerns." The court ordered that the children undergo psychological evaluations, maintained the authorization for therapeutic visits, and continued the pretrial settlement conference to January 2025.

On the day of the continued pretrial settlement conference, CFS filed another additional information for the court. CFS reported that Father had a visit with Diane in December, and he asked her "indirect questions to gather information" about Daniel, the caregiver, and placement. The social worker warned Father that the visit would be canceled and not rescheduled if he discussed the case with the children again. CFS reported that Diane was normally "energetic and talkative," but did not want to talk to anyone after the visit and was "very reserved." CFS further reported that Daniel continued to have suicidal ideation, and he stated that he had "'trauma'" from Father's care. Daniel commented that he and Diane needed protection from Father and the "outside world." Father's therapist opined that although Father had participated in

11

counseling, he "ha[d] not accepted the outcome of his actions that have led to CFS involvement and his son's fear of him." Father had previously reported that he did not abuse any substances, but he tested positive for methadone and marijuana. CFS reported that the children's court-ordered psychological evaluations had not been completed because it did not have contracts with service providers who would conduct such evaluations for minors. CFS had contacted multiple agencies for quotes for the evaluations, but no referrals had yet been submitted. CFS recommended that no services be offered to Father because it would not be in the best interest of the children.

At the pretrial settlement conference, minors' counsel asked the court to find that Father's visits with the children were detrimental. County counsel joined the request, noting that CFS had previously made the same request. The court again left the visitation order intact and warned that if there was any more interference with the caregivers, it would consider finding Father's visits detrimental. Father's counsel set the matter for contest, and the court initially set a further pretrial settlement conference for March 2025 with a trial date for the following day.

For no reason that appears in the record, the matter was recalled later the same day, and the court proceeded without objection to conduct the jurisdiction and disposition hearings. The court sustained the petition. Mother submitted on CFS's recommendation that she receive family maintenance services. Father argued that he should receive services because it was in the children's best interest. Father also argued for conjoint therapy and visits in a therapeutic setting.

12

The court found that Father consistently engaged in behavior that was contrary to the children's best interest. The court removed the children from Father's custody, placed them with Mother with family maintenance services, and did not order any services for Father. The court further ordered that "[t]here will be no visitation between the children and Father," because it would be detrimental and "harmful to their safety and/or emotional well-being."

## DISCUSSION

Father argues that the order terminating his visits constituted an abuse of discretion because, by denying the request for therapeutic visits and failing to postpone the jurisdiction and disposition hearings long enough to obtain the children's psychological evaluations, the juvenile court deprived itself of sufficient information to support the no-visitation order. We disagree.

Under subdivision (a) of section 361.2, if the court orders the removal of a child from parental custody, then the court must determine whether there is a parent with whom the child was not previously residing but who "desires to assume custody of the child." If so, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid*.) Subdivision (b)(3) of section 361.2 provides that when the court orders a parent to assume custody of the child subject to the court's supervision, "the court may (1) order reunification services for the parent 'from whom the child is being removed'; (2) order services 'solely to the parent who is assuming physical custody

13

in order to allow that parent to retain later custody without court supervision'; or (3) order services for both parents, followed by review hearings under section 366 to determine which parent, if either, should have custody of the child. (§ 361.2, subd. (b)(3).)" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1166.) The juvenile court in this case chose the second option, ordering family maintenance services for Mother but no services for Father. (§ 361.2, subd. (b)(3).)

Father argues that subdivision (a)(1) of section 362.1 governs visitation in this case, but that is incorrect. Section 362.1 states that the court "shall provide" for visitation "consistent with the well-being of the child" if the court makes "any order placing a child in foster care" and orders reunification services. (§ 362.1, subd. (a).) Accordingly, "[i]f visitation is inconsistent with the well-being of the child, or would be detrimental to the child, the juvenile court has the discretion to deny such contact." (*In re F.P.* (2021) 61 Cal.App.5th 966, 973.)

Section 362.1 does not apply here, because the court did not order the children placed in foster care and did not order reunification services. And unlike section 362.1, the applicable provision of section 361.2 does not require visitation with the previously custodial parent or require a detriment finding in order to terminate such visitation. (§ 361.2, subd. (b)(3).)

Father's arguments concerning visits in a therapeutic setting and the psychological evaluations are similarly unpersuasive. First, Father's argument that the court erred by "denying [F]ather's requests for therapeutic visitation" fails because it is contrary to the

14

record—the court did authorize CFS to arrange for visits in a therapeutic setting on December 10, 2024.

Second, as to both the therapeutic visits and the psychological evaluations, Father cites no authority for the proposition that the court was required to complete either before terminating visitation. We are aware of no such authority. Again, in contrast to section 362.1, the applicable provision of section 361.2 does not require visitation and does not require a detriment finding in order to terminate visitation with the previously custodial parent.

Third, even if section 362.1 did apply, we would still have to affirm. The juvenile court found that Father's visits were detrimental, that finding is supported by substantial evidence, and Father does not argue otherwise.

For all of the foregoing reasons, Father has not shown that the court abused its discretion by terminating his visitation at disposition.

DISPOSITION

The dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

15